IN RE LINCOLN TRACTION COMPANY (two cases).
LINCOLN TRACTION COMPANY APPELLANT, v. CITY OF LINCOLN ET AL., APPELLEES.

FILED MARCH 1, 1919.   Nos. 20743, 20842.

1. **Constitutional Law: STATE RAILWAY COMMISSION AMENDMENT.** In adopting the constitutional provision creating the state railway commission, it was made an independent part of the Constitution, and not as an amendment to the executive, legislative or judicial articles thereof.

2. Carriers: STATE RAILWAY COMMISSION: POWERS. The state railway commission has independent legislative, judicial and executive or administrative powers so far as necessarily involved in the "regulation of rates, service, and general control of common carriers;" and such exercise of power may be controlled or limited by the legislature.

3. ———: ———: ———. Unless there has been specific legislation that might limit or affect this power given to the commission, it would seem that the people have given this commission all the control over common carriers that they themselves could exercise.

4. ———: RATES. The rates of a public service corporation must be based upon the value of the property devoted to the public use.

5. ———: ———. Rates allowed in other similar cities may be considered by the commission, but would not be controlling.

6. ———: ———: EMERGENCY RATES. If the evidence tending to show that rates are not remunerative, "while based upon actual experience in the operation of the road, relates only to a brief period when conditions were abnormal," it will not necessarily require a change of rates. *Darnell v. Edwards*, 244 U. S. 564. If it is uncertain whether conditions will become more favorable for adequate earnings in the near future, and it seems improbable that they will, the propriety of emergency rates would seem to be indicated.

7. ———: ———: GOOD WILL. When rates are in question, the item of good will is not to be considered.

8. ———: ———: EVIDENCE. In determining the sufficiency of present rates, it would be proper to consider the dividends that had been declared in the recent past under ordinary conditions, but the distribution of these dividends among the stockholders would not throw any light upon the earning power of the property.

9. ———: ———: DIVIDENDS. If the dividends paid were not greater than a fair return on the actual value of the property would justify, and did not exceed the net earnings, the disposition of those dividends among the stockholders would not affect the public interest.

10. ———: ———: ———. If the dividends paid to the various stockholders were more than a fair return upon the property, or in excess of the net earnings of the company, it would devolve upon the company to make good the deficiency, and render such service as is due the public, and is required by the commission.

11. ———: ———: SERVICE. If the earnings are sufficient, the company must be prepared to render proper service as required by the commission.

12. ———: ———: Accounting. When a public utility, which is under the control of the railway commission, owns or is interested in subsidiary utilities in the city which are under the control of the .city authorities, it is proper for the railway commission to require the utility under its control to keep full and accurate accounts of all services rendered to its subsidiary companies, and all values received therefor at prices fixed by the railway commission; and such. values so received must be accounted for as other earnings.

13. ———: ———: Valuation. It is the duty of the company to keep their accounts as required by the commission, and to render all possible assistance to enable the commission to ascertain true values. If the company fails in these respects, it is not in a position to complain of reasonable findings of the commission as to value.

14. ———: ———: Complaint. If the company does not obey the orders of the commission in that regard, and act upon these principles, it cannot complain if the commission is as liberal in dealing with the affairs of the company as it can reasonably be and make sure that it is properly protecting the public.

15. ———: ———: Increase. If, owing to changed conditions, the net earnings of the company, properly managed, are not a fair return upon the value of its property, the rates .should be increased without imposing impossible or unnecessary conditions.

16. Street Railways: Cancelation of Stock. The commission properly decided that it cannot under existing conditions' order the cancelation of the common stock of the company, and when under existing conditions an order canceling stock is not authorized, it cannot be canceled by indirection by withholding from the company that to which it would be otherwise entitled.

17. ———: Authorization of Bond Issue. The commission should know how the proceeds of the bonds are used by the company, and in authorizing the issue of stocks or bonds may determine the price and conditions of their sale, but in a proper case cannot indirectly prevent such issue by imposing impossible or unnecessary conditions.

18. Carriers: Rates: Depreciation Fund: Dividends. Money raised to pay for depreciation should not be considered as capital upon which a return is to be made to stockholders as dividends in the future. But, when, under the rates allowed, dividends are fairly earned and declared, such dividends become the property of the stockholders, and if used to make proper additions to the property, such additions should be considered in adjusting rates.

19. State Railway Commission: Findings: Review. This court upon appeal cannot disturb findings of the commission, unless it ap-

pears that some requirements of the law have been violated or disregarded, or that the result reached cannot reasonably be derived from the facts proved.

APPEAL from the State Railway Commission. *Reversed.*

*E. J. Hainer, F. M. Hall, Field, Ricketts & Ricketts* and *George A. Lee,* for appellants.

*C. Petrus Peterson, Charles R. Wilke, W. G. Kline* and *C. E. Matson, contra.*

SEDGWICK, J.

The plaintiff applied to the state railway commission for permission to raise its rates of service and for authority to issue and sell securities, and also made an application for an emergency rate. The commission, after an extended hearing and apparently an exhaustive investigation of the matters presented, granted the respective applications in part and refused them in part; and the applicant has appealed to this court from the ruling on each application. The applications were heard together, reserving the motion to consolidate the cases for further investigation.

Questions are raised and discussed as to the extent and the limits of the jurisdiction and authority of the state railway commission. In *Prentis v. Atlantic Coast Line Co.,* 211 U. S. 210, the court said in the syllabus: "So far as the federal Constitution is concerned, a state may, by constitutional provision, unite legislative and judicial powers in the same body." And, in the opinion: "Among its (the commission's) duties it exercises the authority of the state to supervise, regulate and control public service corporations, and to that end, as is said by the supreme court of Virginia and repeated by counsel at the bar, it has been clothed with legislative, judicial and executive powers." And that if the state Constitution "sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder so far as the Constitution of the United States is concerned."

In adopting the constitutional provision creating the state railway commission, it was made an independent part of the Constitution, and was not designated as an amendment to the executive, legislative or judicial articles of the Constitution. The fact, therefore, that it has, by the compilers, been placed in article V, which relates to the executive department of the government, affords no assistance in its construction. Its language is clear, as follows: "There shall be a state railway commission, consisting of three members, who shall be first elected at the general election in 1906, whose terms of office, except those chosen at the first election under this provision, shall be six years, and whose compensation shall be fixed by the Legislature." Its powers and duties include "the regulation of rates, service and general control of common carriers." The legislature may make provision as to these powers and duties, but the commission, "in the absence of specific legislation, shall exercise the powers and perform the duties enumerated." It was submitted to the people by the legislature of 1905. Laws 1905, ch. 233. Unless there has been specific legislation that might limit or affect this power given to the commission, it would seem that the people have given this commission all the control over common carriers that they themselves could exercise. While this power must be exercised in harmony with the provisions of the federal Constitution, and the general provisions of our own Constitution that affect all branches of the government, it is plainly not limited by the special provisions of the Constitution which distinguish between the legislative and judicial departments of the government. The functions of this commission are largely administrative, but, as is stated in *Prentis v. Atlantic Coast Line Co., supra,* the commission necessarily has independent legislative, judicial, and executive or administrative powers. This does not mean that the commission is made a court with general judicial powers, but only such judicial

powers as are necessarily involved in performing its duty to supervise, regulate and control public service corporations; and such exercise of power may be controlled or limited by the legislature.

The company appears to contend that the following questions are involved in this appeal: (1) That the rates should be based entirely upon the actual value of the company's property devoted to the public service. (2) That the value of the property, as found by the majority of the commissioners, entitled the company to "an emergency rate of fare." (3) That the schedule of rates should not be lower than "in other cities of the same class, and should be sufficient to pay operating expense, providing for upkeep of the property, and pay a fair return upon the value of the property used and useful in the public service." (4) The order of the commission "requiring the cancelation of the common stock of the traction company is void and should be held for naught." (5) The order "requiring proceedings to be instituted to recover into the treasury dividends paid on the common stock is also null and void and should be so held." (6) "The limitations placed on the use of the proceeds realized on the sale of the stocks and securities authorized is both contrary to law and unjustified."

That the rates should be based upon the present value of the property is thoroughly established by the decisions of the federal courts and other courts. In the famous case of *Smyth v. Ames,* 169 U. S. 466, 546, the court said: "We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stocks, the present as compared with the

original 'cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience." This holding has been adhered to in subsequent decisions of that court, and has been generally followed by public service commissioners. It was followed in some of our decisions, and was recognized as the basis of rates by this court in *State. v. Lincoln Traction Co.*, 90 Neb. 535, in which it was said: "Nor will the valuation by implication fixed by the promotors of the consolidation concerning the value of the property of the constituent corporations and of their stocks and bonds bind the railway commission in determining in a proper case the investment upon which the respondent's stockholders should receive a return in the way of dividends, or the exact amount of the charges that may be exacted for transporting passengers"—citing *Smyth v. Ames, supra,* and other cases.

It is not always easy to fix accurately the present value of such a property, and for that reason resort may be had to the various matters recited in *Smyth v. Ames, supra,* and, as there said, perhaps to other matters. Rates allowed in other similar cities will be considered, but they, of course, would not be controlling. When rates are in question, the item of good will is not to be considered. The value of the good will depends upon dividends, and the certainty of receiving them, and they in turn depend upon the rates allowed. To consider good will as value in fixing rates would lead to the most confusing uncertainties. The commission in August, 1918, increased the rates upon an application of the company, and these applications are for a further

increase. If the evidence tending to show that rates are not remunerative, "while based upon actual experience in the operation of the road, relates only to a brief period when conditions were abnormal," it will not necessarily require a change of rates. *Darnell v. Edwards*, 244 U. S. 564. If it is uncertain, and seems improbable, that conditions will become more favorable for adequate earnings in the near future, the propriety of emergency rates would seem to be indicated. The commission appears to have so regarded existing conditions.

It was said by the Wisconsin railway commission: "A street railway will be permitted to discontinue the sale of 6 tickets for 25 cents where the return for the last 20 months was only about 5 per cent., although the average return for the preceding 6 years was 8.8 per cent., it appearing that the loss during the 20 months from the competitive operation of private automobiles, and jitneys to a less extent, and from higher prices for materials, supplies, and wages is not temporary, that large outlays must be made for paving and for improvements and extensions, that any increase in gross earnings therefrom will be offset by expenses, and that it is doubtful whether an abnormally low cost of injuries and damages can be maintained." *Re Duluth Street R. Co.,* P. U. R. 1916D, 614.

The evidence in this case discloses that no comprehensive and authentic valuation of the present property was before the commission at the time of this hearing. The attempt seems to have been to ascertain its present value from a consideration of the history of the company, and its investments and expenses from the time of the organization of the so-called "Old Traction Company," in 1898, to the present time, and the findings and valuations made by the railway commission itself since the consolidation in 1909. Some of the transactions of the predecessors of the so-called "Old Traction Company" appear also to have been considered.

The present company was organized in February, 1909. Prior to that time companies were operating three street car lines, which were then consolidated. This was before the enactment of the statute known as the "Stocks and Bonds Statute." Laws 1909, ch. 108. The stocks and bonds of the companies so consolidated forming the present company (called in the briefs "The New Company") appear to have been greatly in excess of the actual values of the properties involved. In order to effect a consolidation of the interests of the various stockholders in the different companies, there appears to have been extravagant uses of stocks and bonds of the new company. Preferred stock was used apparently without much regard to values that it represented, and was distributed to induce former stockholders to consent to the consolidation. Also, a large amount of common stock was used and generally disposed of in the same way. These conditions were stated more fully, and the results in some respects considered, in *State v. Lincoln Traction Co., supra.*

The commissioners were not entirely agreed as to the disposition of these applications. A majority apparently formed a conclusion as to the present value of the property, and appear to have concluded that the present rates were insufficient to pay a fair return upon that valuation, but refused to increase the rates because of the present conditions of the stocks and bonds of the company, and perhaps for other reasons. In the opinion of the commission it is said: "It is true that the operating revenues for the calendar year 1917 were insufficient to pay the dividends on the preferred stock by $22,305.83. The increase in operating expenses for the calendar year 1918, by reason of increased wages, cost of materials and supplies, and freight rates may create a greater deficiency, even though the gross operating revenues remain constant. We do not advocate the policy of allowing a depletion of the entire surplus reserves, and we are of the opinion that, should the

reserves continue to be reduced by reason of high cost of operation, the commission should take time by the forelock and raise the rates; but certainly the commission should not raise the rates and place a greater burden upon the people until the company itself has done its full duty. The commission will, through the medium of the monthly reports of the applicant, keep in close touch with the operating results for the future, and when the company has done its duty by making good to the public the operating revenues properly belonging to the surplus account, should the surplus account, together with the future operating revenues, not be sufficient adequately to take care of the company, the commission will immediately raise the rates.''

The commission found that they did not have authority to cancel the excessive issue of common stock, but refused to increase the rates until the company, by its own acts, should cancel the stock. They also found that the company had paid the last few years a large amount of money as dividends upon that common stock that represented no value, and ordered that the company should, by legal action, recover the money so paid out as dividends on the common stock, together with interest thereon. The cancelation of this common stock, with other similar matters, was considered in *State v. Lincoln Traction Co., supra,* and it was held: ''If, in a consolidation of constituent street railway companies which theretofore satisfactorily served the public, all of their tangible property is conveyed to the consolidated corporation and subsequently improved, the mere fact that the stock and bond issues of the constituent corporations were doubled by the consolidated corporation, without greatly adding to the tangible assets, will not justify a cancelation of that stock. And if to cancel one class of that stock will take from part of the stockholders the consideration for their agreement to consolidate the constituent corporations and will not interfere with the consideration received by other stockholders,

none of the stock should be canceled if the consolidation be permitted to continue.''

The same reasoning applies here. The patrons of this utility are not especially interested in the division of the dividends among the stockholders. They should not be required to pay greater fares than actually necessary to pay a fair return on the value of the property devoted to the public use. If the commission could not directly cancel the common stock, it could not do so indirectly by withholding from the company that to which it would be otherwise entitled.

In determining the sufficiency of present rates, it would be proper to consider the dividends that had been declared in the recent past under ordinary conditions; but, as already stated, the distribution of these dividends among the stockholders would not throw any light upon the earning power of the property. If the dividends paid to the various stockholders were more than a fair return upon the property, or in excess of the net earnings of the company, it would devolve upon the company to make good the deficiency, or run the risk of a receivership in case it was impossible to render such service as is due the public and is required by the commission. But if, owing to changed conditions, the net earnings of the company, properly managed, are not a fair return upon the investment, the rates should be increased without driving the company to remedies so doubtful as suits to recover dividends long ago declared and paid. If the company has paid dividends to stockholders beyond the net earnings, and so failed to accumulate a reserve for maintenance and emergencies, it has assumed a risk that common prudence would suggest should be immediately remedied; for if the earnings are sufficient the company must be prepared to render proper service as required by the commission. If it fails to do so through an unlawful dissipation of its funds, the public would necessarily use drastic remedies to secure proper service. If the dividends paid were not greater than a fair return on the actual

value of the property would justify, and did not exceed the net earnings, the disposition of those dividends among the stockholders would not affect the public interest.

Since the consolidation the commission has had occasion several times to investigate the property of the company and adjust the rates. One of the first questions investigated arose from the fact that other public utilities are operated in connection with the traction company, which are not under the control of the commission, but under the city authorities, and in 1910 the commission determined some of the questions so presented. In the Third Annual Report of the commission, p. 133, it is said: "At the hearing in this case an attempt was made to find the value of the street railway proper, in order that rates might be so fixed that the income from the same would be fair to the street railway company and to the general public as well. * * * It was contended by the city attorney of Lincoln that the commission should not segregate these properties, but should take them as a whole, and determine what rate should be charged to produce a reasonable income on the entire property. The commission found itself in this predicament: The state Constitution and legislature have given it power to fix rates and service of common carriers, which includes street railways, but nowhere has it been delegated any authority over public utilities such as heating, lighting and power plants. * * * The commission agrees with the contention of the city attorney that there should be a fixed and compensatory charge made by the Lincoln Traction Company for all services rendered to any other or subsidiary company for services, and all such amounts so earned must be made a part of its income account. * * * If the heat and light which are being furnished to these subsidiary lines of business are furnished by the railway company at a rate that is not compensatory to it, the commission has jurisdiction and authority to do full justice in that respect by adjusting such charges."

And again in the same year, in another matter, the commission found and ordered as follows (Third Annual Report p. 142): "That "from and after July 1, 1910, the accounts pertaining to the railway shall be kept in books separate and distinct from the books and accounts of the light or power or heating departments; that all operating accounts shall on the books show the actual amounts of expenditures, accurately and fully set out, and not altered by any apportionments to other departments (excepting only from material account), or by any method or subterfuge; that there shall be charged to the commercial light and power and heat departments all expenditures made for their account, and, in lieu of charges heretofore made by apportionment of certain operating expenses, there shall be charged by the railway to the light and power departments two and one-half (2 1/2) cents per kilowatt hour for each kilowatt hour of current furnished to said commercial light and power departments, which shall be accurately and faithfully measured by meter at the power house, and the railway shall charge to the commercial heating department twenty-seven (27) cents per one thousand (1,000) pounds of condensation furnished, as shown by monthly readings of customers' meters, all of which records shall be strictly kept and retained for reference and examination, if desired, and the amounts so charged by the railway to the commercial light and power and heating departments shall by said departments be paid over to the railway in cash monthly, and the amounts so charged shall in the railway books be treated as earnings and accounts opened and kept to set forth such earnings."

In a former hearing of an application by this company, the commission found: "It is very unfortunate that, in the presentation of this case, so much that is in no way material to the solution of the problem has been injected into the evidence. * * * No hard and fast rules can be established in respect to a fixed rate of income

upon investments of this nature, but we have no hesitancy in saying that under ordinary conditions, where the good faith of the company and its fairness with respect to its patrons appears, the maximum return to such investors (provided the rate charged is not an unusual one) should not exceed 3 per cent. in excess of the customary and existing rate of interest received by those whose investments are represented in fixed interest-bearing securities. In other words, the building of electric lines should be encouraged, and the returns upon such investments should be sufficiently large to attract capital to such enterprises. If the rate of interest on fixed interest-bearing securities in any given locality is 5 per cent., a maximum return to the investors in electric railways would not be unreasonable or excessive at 8 per cent." Fourth Annual Report, pp. 92, 96.

A year later, in another case, the commission determined what they said was a fair valuation as a basis for earnings and depreciation. In the Fifth Annual Report, p. 96, it is said: "Preliminary and prior to the hearing, this commission had caused a further and exhaustive investigation and examination of the affairs of the Lincoln Traction Company to be made by its accountants, Messrs. Powell and Wettling, whose report was presented to the commission and placed on file on March 7, 1912.  *  *  *  The value so shown in the report to be used as a basis for earnings is $2,244,639.54.  *  *  . Taking all these matters into consideration, the commission is of the opinion that the amounts stated are a fair valuation as bases for earnings and depreciation." The commissioner dissenting from the opinion of the majority said that the rate of return "must be sufficient, under all circumstances, to attract capital to that particular enterprise."

Money raised to pay for depreciation should not be considered as capital upon which a return is to be made to stockholders as dividends in the future, but "that it was right to raise more money to pay for deprecia-

tion than was actually disbursed for the particular year there can be no doubt, for a reserve is necessary in any business of this kind, and so it might accumulate; but to raise more than money enough for the purpose and place the balance to the credit of capital upon which to pay dividends cannot be proper treatment." *Louisiana Railroad Commission v. Cumberland Telephone & Telegraph Co.,* 212 U. S. 414. But when dividends are fairly earned under the rates allowed, and are declared, such dividends become the property of the stockholders, and, if used to make proper additions to the property, such additions should be considered in adjusting rates.

These findings and orders seem to be justified and necessary. It would appear that, if these orders are complied with, the commission from the books of the company, can find the amount that the company has received from the subsidiary companies for services rendered, and such sums will, of course, be added to its other revenues to determine its earnings. These subsidiary companies should be treated as are other patrons of the traction company. The commission will see that all values received from them are fully accounted for.

It is the duty of the company to keep their accounts as required by the commission, and to render all possible assistance to enable the commission to ascertain true values. If the company in maintaining subsidiary companies, or for any other reason, fails to so regulate its business and so keep its accounts that its receipts from such subsidiary companies can be accurately determined, or fails to submit to the commission an accurate and approved inventory and valuation of its property, it is not in a position to complain of reasonable findings of the commission as to value, if the commission is as liberal in dealing with the affairs of the company as it can reasonably be and make sure that it is properly protecting the public. This court upon appeal cannot disturb such findings of the commission, unless it appears that some requirements of the law

have been violated or disregarded, or that the result reached cannot reasonably be derived from the facts proved.

The application to issue bonds, or preferred stock, was allowed upon condition "that said bonds or stock, or both collectively, shall be issued and sold for money only, and for not less than 85 per cent. of the par value thereof." If the company can issue bonds bearing 6 per cent. interest, and the stockholders are allowed to purchase the bonds for a nominal price, they can obtain almost any rate of interest they desire on such an investment, to the prejudice of the common stock, and perhaps to the public also. The commission should know how the proceeds of the bonds are used by the company, and the foregoing restrictions are, so far as is shown by this evidence, within the reasonable discretion of the commission.

The conditions that the company shall bring actions to recover dividends heretofore paid, and shall pay no more dividends on certain common stock, and shall take steps to cancel such stock, cannot be upheld.

The commission has evidently devoted great care in an attempt to do justice to the company and to the public. We have found it wrong in regard to some difficult constructions of the Constitution and statutes, above specified; when these are corrected there is no doubt that just conclusions will be reached. As these several applications have been by us considered together, it seems best that the commission shall have an opportunity to consider the whole contention *"de novo"* in the light of the construction of the law that we have indicated; and for that reason the orders in the three several applications are reversed and all remanded for the further consideration of the commission.

REVERSED.

ALDRICH, J., dissents.

CORNISH, J., not sitting.