STATE OF NEBRASKA EX REL. ROBERT M. SPIRE, ATTORNEY
GENERAL OF THE STATE OF NEBRASKA, RELATOR, V. GERALD A.
CONWAY, RESPONDENT.

472 N.W.2d 403

Filed July 26, 1991.    No. 90-097.

Robert M. Spire, Attorney General, and Dale A. Comer for relator.

Robert A. Skochdopole and Thomas D. Wulff, of Kennedy, Holland, DeLacy & Svoboda, for respondent.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

This original action in quo warranto brought by the State of Nebraska through the relator, Robert M. Spire, its Attorney

General, challenges the right of the respondent, Sen. Gerald A. Conway, to hold a position as an assistant professor at Wayne State College while simultaneously serving as a member of the state's Unicameral Legislature.

The college is a state institution under the government of the Board of Trustees of the Nebraska State Colleges, pursuant to Neb. Const. art. VII, § 13, and Neb. Rev. Stat. § 85-301 (Cum. Supp. 1988). The State contends that because he is a senator, respondent's assistant professorship violates the distribution of powers clause found in Neb. Const. art. II, § 1, which reads:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted.

(Inasmuch as the quoted language is the only section this article has ever contained, we hereafter refer to the provision simply as article II.)

Respondent became a member of the Legislature, representing the 17th legislative district, in 1985. He was reelected to this position on November 8, 1988, and took his oath as a legislator in early January 1989. The unsuccessful competing candidate for the seat contested the reelection, contending that respondent was not eligible to hold the office. However, the Legislature determined otherwise and dismissed the contest.

Respondent has been teaching in the business division of the college since 1975, first as an instructor and then, upon obtaining tenure in 1979, as an assistant professor. His appointment is renewed each year, and he accepted a renewal on July 14, 1989, for the 1989 academic year. This action was commenced on January 17, 1990.

While the employment policy manual of the Nebraska state colleges does not specify the rights attendant to tenure, it does provide that of "all rewards and recognitions offered by a college to its faculty members the offer of tenure is the most significant of all," demonstrating success in "satisfying the college — its faculty, administration, and board — during a

rigorous probationary period that he/she is worthy of becoming a recognized member of the faculty with full rights and privileges." Although the policy does not detail how the employment of one having tenure may be terminated, it does provide that those not having such status "shall assume they are serving in a probationary capacity," and specifies that, with certain exceptions, " '[p]robationary faculty may be terminated for any reason without right of grievance or hearing. . . .' "

As an assistant professor, respondent serves under the direction of the division chairperson, who assigns respondent's duties and responsibilities. Respondent prepares syllabi, prepares and delivers lectures, and presides over classroom activities for the courses he teaches. Subject to the approval of his division chairperson, respondent may select the books to be used in his classes. He determines the required reading for his classes and assigns those readings, along with other course-related assignments, as he deems appropriate. He also prepares or selects testing materials, grades those tests, and assigns his students their overall grade for each of his courses.

The college does not provide respondent with either a secretary or administrative staff, and respondent has no administrative duties. Although he may advise as to course offerings, he does not determine the courses to be offered by the business division. The record does not indicate whether he chooses or is assigned the classes he is to teach. The number of class hours respondent teaches is set by the division chairperson.

Although respondent is responsible for maintaining control over his classroom and students during class sessions, he cannot directly or formally discipline any student except through established college disciplinary procedures, and he has no authority over the selection of his students. He is not involved in setting the budget of the college, nor does he have any official duties off campus unless such are specifically assigned to him by his superiors.

Respondent's position with the college does not require him to take an oath of office. His salary is set through collective bargaining, but he is not a dues-paying member or officer of the

collective bargaining unit. At the time this action was commenced, respondent's salary for the 8-month academic year ending in May 1990 was set at the highest level since his employment.

After becoming a senator, respondent requested and received from the Board of Trustees unpaid leaves of absence for the periods in which the Legislature was in regular session. The board's policy manual on leaves of absence provides that "[n]ormally, with the exception of political leaves, a leave without pay will not be granted more often than once very [sic] four years." The policy also declares that "[w]ith the exception of political leaves, unless there is an unforeseen reason, a leave of absence must be arranged at least one semester before the leave is granted." Political leaves are available to state college employees who are elected or appointed to state or national office, or who are candidates for such offices.

During his leaves of absence, respondent received no pay, insurance, retirement, or other employment benefits. However, the board did not give him a formal leave of absence during the occasions he attended several special sessions of the Legislature. Instead, the college administration removed him from the payroll for all but the November 1989 special session. The record is silent as to whether respondent received insurance, retirement, or other benefits for those periods. The record does, however, demonstrate that he has participated in interim legislative studies while on the college's payroll and that he has available to him on a year-round basis a Capitol Building office and a two-person staff housed in that building.

## APPROPRIATENESS OF REMEDY

As a threshold question, we must determine whether quo warranto is an appropriate means to challenge the right of an assistant professor at a state college to hold his position. Neb. Rev. Stat. § 25-21,121 (Reissue 1989) permits the filing of an action in quo warranto "against any person unlawfully holding or exercising any public office or franchise within this state . . . or when any public officer has done or suffered any act which works a forfeiture of his office . . . ." This court's jurisdiction, then, depends upon whether an assistant professor at a state

college holds or exercises a "public office" within the meaning of § 25-21,121.

The cases from other jurisdictions respondent cites in support of his position that an assistant professor is not an officer of the executive department dealt with constitutional prohibitions on dual office holding and not with quo warranto. The applicability of those cases to the dual services question is discussed later, but the preliminary question regarding the applicability of quo warranto is resolved under the law of this jurisdiction.

In *Eason v. Majors*, 111 Neb. 288, 196 N.W. 133 (1923), we held that Eason, a teacher serving as head of the English department of the state normal school at Peru, was a public officer and thus could maintain an action in quo warranto to test the validity of his ouster and replacement. In determining that Eason exercised some portion of the sovereign power and that he thus was a public officer within the meaning of the quo warranto statute, this court stated:

> When a position based upon a provision of law carries with it continuing duties of public concern which involve some exercise of the sovereign power in their proper performance, the position may be said to be an office public in character. Perhaps a better definition is that given by the New Jersey court in *Fredericks v. Board of Health*, 82 N. J. Law, 200:
>
> "An office is a place in a governmental system created or recognized by the law of the state which, either directly or by delegated authority, assigns to the incumbent thereof the continuous performance of certain permanent public duties."

111 Neb. at 291, 196 N.W. at 134.

Arguing that subsequent decisions in *State, ex rel. O'Connor, v. Tusa*, 130 Neb. 528, 265 N.W. 524 (1936), and *Home Savings & Loan Ass'n v. Carrico*, 123 Neb. 25, 241 N.W. 763 (1932), defined "office" more narrowly, respondent suggests that *Eason* was an aberrant decision.

In *Home Savings & Loan Ass'n, supra*, Home Savings sought to garnish money owed Carrico for defending an indigent in the Adams County District Court. Home Savings'

ability to reach the funds via garnishment was dependent upon finding Carrico either an employee or an officer of the county. This court addressed the question of whether an attorney assigned by the district court to defend an indigent accused of a felony was, by virtue of that assignment, an officer or employee of the county in which the court sat. We concluded that he was neither an officer nor an employee, and stated that "a public officer is an incumbent of a public office, which is the right, duty and authority conferred by law, by which, for a given period, an individual is invested with some portion of the sovereign functions of government for the benefit of the public." *Id.* at 30, 241 N.W. at 765.

In *State, ex rel. O'Connor, supra* at 535-36, 265 N.W. at 528, office was defined as

"a public station or employment, conferred by the appointment of government; and embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 6 Wall. (U. S.) 385, 18 L. Ed. 830.

"The words 'office' and 'officer' are terms of vague and variable import, the meaning of which necessarily varies with the connection in which they are used, and, to determine it correctly in a particular instance, regard must be had to the intention of the statute and the subject-matter in reference to which the terms are used." [Citation omitted.]

It may be said that the almost universal rule is that, in order to indicate office, the duties must partake in some degree of the sovereign powers of the state. The rule is laid down in 22 R. C. L. 374, sec. 4, as follows: "One of the most important criteria of a public office is that the incumbent is vested with some of the functions pertinent to sovereignty, for it has been frequently decided that in order to be an office the position must be one to which a portion of the sovereignty of the state, either legislative, executive, or judicial, attaches for the time being."

Contrary to respondent's suggestion, *Eason* is not an anomaly; in reality, the foregoing three cases are in complete agreement as to the definition of public office: It is a governmental position, the duties of which invest the

incumbent with some aspect of the sovereign power. As noted in *Eason* at 291-92, 196 N.W. at 134:

> The teacher has a special place by the nature of things in the governmental system, so far as it provides for education. He is appointed and paid by the state. His place—we may well say his office—is created by the state because only through him can its free education be transmitted. Nor is he a mere conduit. Quite the contrary. For education can not be poured out to people like water from a pitcher. It must be carried to them in such a way as to engage their interest and reach their understanding, a labor involving knowledge of method, exercise of authority, and wide use of discretion. A teacher must prescribe courses, establish discipline, convince, lead. In the due performance of his duty he not only engages in a work of public concern, but wields a portion of the sovereign power.

There is nothing of record which demonstrates that a teacher is less important to our society today than he or she was in 1923 when *Eason* was decided. Indeed, in one of the more important and relatively recent judicial pronouncements in the field of education, the U.S. Supreme Court said: "Today, education is perhaps the most important function of state and local governments." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873 (1954). It is the teacher in the classroom who has the most effect upon the students, and it is through the teacher that the educational policies of the state are executed.

The normal schools which were at issue in *Eason* are now the state colleges. See *State ex rel. Spire v. Beermann*, 235 Neb. 384, 455 N.W.2d 749 (1990). Although respondent does not choose the courses offered, he has considerable discretion in how he teaches the subject matter. He prescribes the course materials. He is responsible for establishing classroom discipline and mental discipline in his students. He must challenge, convince, and lead his students, and he evaluates their performance. Respondent's position at the college is every bit as much a public office as was Eason's position at Peru, and his position of assistant professor at the college therefore is one

which may be challenged by quo warranto.

## EFFECT OF LEGISLATIVE DETERMINATION

Further exploration of the issues must begin with the recognition that the Legislature has decided that respondent's position at the college does not prohibit him from taking his seat in the Unicameral. Because the Legislature is the sole judge of the qualifications of its members, Neb. Const. art. III, § 10, we must determine what effect, if any, that decision has upon our ability to consider this case. The same principle of the separation of powers which is at the heart of this controversy prevents us from hearing a matter the determination of which the Constitution entrusts to another coordinate department, or branch, of government.

We are not being asked, however, to determine whether respondent may retain his legislative seat; rather, we are being asked to determine his right to his position at the college. Unlike the question answered by the Legislature, this is not one which the Constitution has entrusted to another branch of government. Regardless of our decision in this case, respondent's right to sit in the Unicameral is as secure as that of any other member. The doctrine of separation of powers does not, therefore, prevent our adjudication of this matter. See, *State v. Evans*, 735 P.2d 29 (Utah 1987); *Monaghan v. School District No. 1*, 211 Or. 360, 315 P.2d 797 (1957).

## NATURE AND APPLICATION OF ARTICLE II

We thus reach the central issue. The language of article II prohibits one branch of government from encroaching on the duties and prerogatives of the others or from improperly delegating its own duties and prerogatives. See, e.g., *State ex rel. Meyer v. State Board of Equalization & Assessment*, 185 Neb. 490, 176 N.W.2d 920 (1970); *McDonald v. Rentfrow*, 176 Neb. 796, 127 N.W.2d 480 (1964). This is its institutional aspect, which serves as the beam from which our system of checks and balances is suspended.

Article II also prohibits certain persons from serving two branches of government concurrently. This is its personnel, or individual, aspect. This aspect serves as a check against the concentration of power, and guards against conflicts of interest

which arise when one serves two masters. It has been said that " '[t]he maintenance of a strict prohibition upon dual membership of the legislative and executive branches has no doubt been the most significant aspect of the doctrine [of separation of powers] in forming the special character of American government . . . .' " Matheson, *Eligibility of Public Officers and Employees to Serve in the State Legislature: An Essay on Separation of Powers, Politics, and Constitutional Policy*, 1988 Utah L. Rev. 295, 306 (quoting M. Vile, Constitutionalism and the Separation of Powers 134 (1967)). The aspect with which we are presently concerned is this second, personnel aspect of the distribution of powers clause.

### MEANING OF "BEING ONE OF THESE DEPARTMENTS"

The specific question we must answer is whether respondent, because he is both a state senator and an associate professor at a state college, is a "person . . . being one of these departments" who exercises "any power properly belonging to either of the" other departments. Respondent does not dispute the fact that, as a senator, he exercises the powers of the legislative branch. Rather, he contends that an assistant professor at a state college is not an executive officer and does not exercise any power properly belonging to the executive and that, therefore, holding the two positions does not offend the dual services prohibition of article II.

While, as discussed earlier, the officer-employee distinction is relevant to the question of whether quo warranto is applicable, it is not determinative of the issue now under consideration, for article II does not speak in terms of officers or employees; it speaks of persons "being one of" the branches of government.

This is the first time we have been asked to determine the scope of the dual services prohibition. Our determination is dependent in part upon the meaning of the phrase "being one of these departments." In conducting our study we are bound by the cardinal rule that courts must apply and enforce the Constitution as it is written. Moreover, constitutional provisions are not open to construction as a matter of course; construction of a constitutional provision is appropriate only

when it has been demonstrated that the meaning of the provision is not clear and that construction is necessary. *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). If a constitutional provision must be construed, its words are to be interpreted in their most natural and obvious sense, although they should receive a more liberal construction than statutes and are not subject to rules of strict construction. *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987).

The unusual expression "being one of these departments" is not clear; accordingly, construction is necessary. One thing that is clear, however, is that "being one of these departments" is not intended to be synonymous with "exercising any power of" a branch. Had such identity of meaning been intended, identical language would surely have been used. That is what was done by the framers of the Constitutions of Colorado (Colo. Const. art. III), Idaho (Idaho Const. art. II, § 1), Montana (Mont. Const. art. III, § 1), New Mexico (N.M. Const. art. III, § 1), Virginia (Va. Const. art. III, § 1), West Virginia (W. Va. Const. art. V, § 1), and Wyoming (Wyo. Const. art. II, § 1). The Oregon Supreme Court has refused to read the terms "functions" and "duties" in the separation of powers provision of that jurisdiction's Constitution as being synonymous for the same reason. See *Monaghan v. School District No. 1*, 211 Or. 360, 315 P.2d 797 (1957).

The language of a constitutional provision is to be interpreted with reference to established laws, usage, and customs of the country at the time of its adoption, but its terms and provisions are constantly expanded and enlarged by construction to meet the advancing affairs of humankind. *In re Application A-16642, supra.* With this in mind, we turn to the historical record and examine the evolution of the relevant provisions of our Constitution.

Article II was adopted as part of the Constitution of 1875. Normally, we would turn to the debates of the relevant convention as part of our search for clarification of ambiguous constitutional language. Unfortunately, the proceedings of the 1875 Constitutional Convention are lost. See, 1 Neb. Const. Convs. 7 (1906); *Jaksha v. State*, 222 Neb. 690, 385 N.W.2d 922

(1986); *State ex rel. Johnson v. Chase*, 147 Neb. 758, 25 N.W.2d 1 (1946). We thus cannot avail ourselves of the debates of that convention and must look elsewhere to determine the intent of the framers of the phrase at issue.

Notwithstanding that the journal of the 1875 convention has survived, it is of little help. It merely indicates that article II was the last provision to be adopted by the convention, apparently with little or no debate. 3 Neb. Const. Convs. 672 (1913). A provision identical to article II, however, was a part of the proposed Constitution of 1871. Although that Constitution was rejected by the people, many of its provisions, including what was to become article II, found their way unchanged into the 1875 Constitution. The drafters of the Constitution of 1871 were influenced by the Constitution recently adopted by Illinois, see, e.g., 1 Neb. Const. Convs. 522 (1906) and 2 Neb. Const. Convs. 359 (1907), and some provisions, including that which was to become article II, appear to have been taken verbatim from that document. Compare, e.g., Neb. Const. 1871 Preamble; art. I, §§ 3, 7, 9, 10, 14-17, and 24; and art. II *with* Ill. Const. 1870 Preamble; art. II, §§ 3, 7, 9, 10, 14-17, and 20; and art. III.

*Saxby v. Sonnemann*, 318 Ill. 600, 149 N.E. 526 (1925), determined that the Illinois provision prohibited a member of the state Legislature from receiving compensation for acting as a deputy and assistant to the Attorney General. In so ruling, the Illinois Supreme Court stated at 604-06, 149 N.E. at 528:

> By this provision the people intended to provide, and did provide, a complete separation of the branches and completely deprived a member of one branch of authority to exercise any power properly belonging to the other two branches. Under the constitution of 1818 nearly all the important offices of government were filled by an election on joint ballot of the two houses of the legislature, alone. This system gave rise to injurious combinations affecting legislation and combining the departments of government. In forming the constitution of 1848 one of the things sought was to prevent the performance of duties and exercise of powers in one department of government by members of either of the other departments. In order

that this might be brought about there was inserted in that constitution, as article 2, a provision in effect the same as article 3 of the present constitution [the provision identical to our own article II]. . . .

. . . The language is plain that no person of one department shall exercise any power properly belonging to another department of the State government. . . .

The appellant contends that the above provision [article 3] can apply only to cases where a member of one department acts as an officer in another department, and not to one acting in a purely ministerial capacity. There is no language in the article which limits the application of it to persons of one department acting as officers of another department. The language is, "no person" shall exercise "any power" properly belonging to another department, and the simple question arises here, Did the appellant, in the service performed, exercise any of the powers of the executive department of the State government?

Thus, Illinois considered the phrase "being one of these departments" to mean "being a member of one of these departments," and the distinction between "officer" and "employee" was not relevant to that portion of the inquiry. This reading is not, however, the interpretation Illinois has since given *Saxby*.

In 1960, Illinois held that article III of that state's Constitution did not apply to legislators performing purely ministerial duties. See *The People v. Capuzi*, 20 Ill. 2d 486, 170 N.E.2d 625 (1960). The *Capuzi* court focused on the following language in *Saxby* and apparently ignored the language we quoted earlier:

"It may readily be conceived that one who serves as an investigator merely, collecting facts, and who thereby prepares himself to become a witness in a lawsuit, or who engages in similar service, is not exercising powers peculiar to the department of government by which he is employed, and is not, therefore, within the inhibition of article 3 of the constitution, though he may be a member of the different department of government. This is so because such employee exercises no powers of a

department in which he works."
*The People v. Capuzi, supra* at 492-93, 170 N.E.2d at 629 (quoting *Saxby, supra*).

From this, the *Capuzi* court concluded that a member of one coordinate branch who was employed by a second branch but did not exercise the powers of the second branch did not fall within the constitutional provision. The *Capuzi* court did not, however, question *Saxby*'s reading of "being one of these departments" as meaning being a member of such a branch. The question on which it appears to have focused was whether a state legislator who also held a ministerial position under the judicial branch exercised the powers of the judiciary. The *Capuzi* court did not consider whether the judicial employee exercised the powers of the Legislature. Because it failed to consider this second question, *Capuzi* treated "being one of these departments" as synonymous with "exercising the powers" of a branch.

While we would not presume to take issue with the Illinois Supreme Court's reading of its own precedents or its interpretation of the Constitution of its state, we do find the *Capuzi* analysis unsatisfactory when applied to our Constitution. This jurisdiction requires that its Constitution, as amended, be read as a whole. *Jaksha v. State*, 222 Neb. 690, 385 N.W.2d 922 (1986); *Elmen v. State Board of Equalization and Assessment*, 120 Neb. 141, 231 N.W. 772 (1930). There are three provisions in the Nebraska Constitution which relate to the ability of an individual to hold more than one position under the authority of the state. The first is article II set out above. The other two are Neb. Const. art. III, § 9, and art. IV, § 2. While article II has remained unchanged since it was first adopted in 1875, over the years the people have modified the other two provisions.

Since the Constitution must be read in connection with the facts of history and development of the representational form of government, see *Dwyer v. Omaha-Douglas Public Building Commission*, 188 Neb. 30, 195 N.W.2d 236 (1972), a brief overview of these changes is in order.

Under the Constitution of 1866, Neb. Const. art. III, § 15, provided: "No member of congress, or other person holding

office under the authority of this state, or of the United States, shall execute the office of governor, except as herein provided." This provision was replaced by article V, § 2, in 1875, which expanded the disqualification to cover all executive officers, but removed the bar for federal officers. The relevant portion of the provision read as follows: "None of the officers of the executive department shall be eligible to any other state office during the period for which they shall have been elected." In the past, we have given this provision broad application, holding that it prevented the Lieutenant Governor from seeking the nomination of his party for the post of Governor. See *State, ex rel. McKelvie, v. Wait*, 95 Neb. 806, 146 N.W. 1048 (1914).

The 1920 amendments to the Constitution expanded the executive branch, and the disqualification contained in article V, § 2 (which became the present article IV, § 2), was expanded correspondingly, to wit: "None of the officers mentioned in this article shall be eligible to any other state office during the period for which they have been elected or appointed." This section was again amended in 1962, expressly permitting the Lieutenant Governor to be eligible to be a candidate for Governor.

In 1966, article IV, § 2, was amended into its present form. The exception for the Lieutenant Governor was removed, and the second sentence was changed to read: "None of the *appointive* officers mentioned in this article shall be eligible to any other state office during the period for which they have been appointed." (Emphasis supplied.) This change appears to have been effected in order to permit all the elective executive officers to be eligible as candidates for other executive positions.

The strictures of article IV, § 2, operate as a prohibition against appointive executive officers' holding other positions in the executive or any other branch of state government. In this respect, article IV, § 2, is somewhat broader than the prohibition of article II against holding positions in different branches, although, since article IV, § 2, is applicable only to appointive executive officers, it is, in that respect, narrower than article II.

The earliest predecessor of article III, § 9, which prohibits

dual office holding by legislators, was Neb. Const. art. II, § 14, of the Constitution of 1866:

> No person being a member of congress, or holding any military or civil office under the United States, shall be eligible to a seat in the legislature; and if any person shall, after his election as a member of the legislature, be elected to congress, or be appointed to any office, civil or military, under the government of the United States, his acceptance thereof shall vacate his seat.

The analogous provision adopted in 1875 as article III, § 6, was much broader; the disability extended not only to those holding office under the authority of the United States, but also to those holding any lucrative office under the authority of the state:

> No person holding office under the authority of the United States, or any lucrative office under the authority of this state, shall be eligible to or have a seat in the legislature; but this provision shall not extend to precinct or township officers, justices of the peace, notaries public, or officers of the militia; nor shall any person interested in a contract with, or an unadjusted claim against the state, hold a seat in the legislature.

That the framers thought it necessary to provide an explicit exception for "precinct or township officers, justices of the peace, notaries public, or officers of the militia" indicates that the disqualification of the holder of "any lucrative office under the authority of this state" was intended to have broad scope. Clearly, the framers did not envision it as applying only to constitutional officers.

In 1972, this disqualification was again expanded. The exceptions for justices of the peace, notaries public, and precinct, township, and militia officers were dropped and a new disqualification was added. The provision (renumbered as article III, § 9, in 1920) now reads:

> No person holding office under the authority of the United States, or any lucrative office under the authority of this state, shall be eligible to, or have a seat in the Legislature. No person elected or appointed to the Legislature shall receive any civil appointment to a state

office while holding membership in the Legislature or while the Legislature is in session, and all such appointments shall be void.

This review of the evolution of article III, § 9, shows a continuing expansion in the disqualification placed upon legislators' holding other government positions.

With that in mind, we return to the language of article II. If the phrase "being one of" were to be construed as if it read, "acting in the capacity of," the relevant passage would declare that "no person or collection of persons [acting in the capacity of] one of these departments, shall exercise any power properly belonging to either of the others." Under such a construction, a violation of the personnel aspect of article II would occur only if an individual simultaneously serving more than one branch discharged his or her multibranch duties at one and the same time. Such a reading would thus leave article III, § 9, dealing with the legislative branch, and article IV, § 2, dealing with the executive branch, as the only bans against multibranch office holding. The problem with such a construction is that there would then be no constitutional prohibition against a member of the judiciary's serving as an elected executive officer, so long as that person did not discharge the duties arising from the two positions at the same time. This would be so because the article on the judiciary, article V, contains no provisions analogous to article III, § 9, and article IV, § 2. While article III, § 9, prohibits sitting judges from serving in the Legislature, article IV, § 2, only applies to appointive executive officers. Thus, there would be no constitutional prohibition against, for example, a single individual's serving as both Chief Justice and Attorney General. Clearly, the framers did not contemplate such a bizarre result.

Indeed, the development of the prohibitions now found in article III, § 9, and article IV, § 2, evidences an expanding constitutional predisposition against multibranch public service. The continual expansion of these restrictions via amendments to the Constitution demonstrates the intention of both the framers and the body politic that such restrictions be interpreted broadly.

Thus, the relevant provision of article II cannot be construed

as meaning "no person or collection of persons [exercising any power of] one of these departments," as respondent suggests, but, rather, must be read as construed in *Saxby v. Sonnemann*, 318 Ill. 600, 149 N.E. 526 (1925): "no person or collection of persons being [a member of] one of these departments."

As a consequence, article II prohibits one who exercises the power of one branch—that is, an officer in the broader sense of the word—from being a member—that is, either an officer or employee—of another branch. Is respondent a member of one branch exercising the power of another? There are two formulations this question can take: (1) Is the respondent, as an assistant professor of a state college, a member of the executive branch, and does he exercise any powers of the Legislature? or (2) Is the respondent, as a state senator, a member of the legislative branch, and does he exercise any powers of the executive? If the answer to either of these formulations is yes, then respondent, by holding both positions, is in violation of article II.

### GOVERNMENTAL POWERS AND BRANCHES

It is beyond debate that a senator is a member of the legislative branch of the state and exercises the powers of that branch. The issue thus becomes: Is an assistant professor at a state college a member of the executive branch?

Respondent argues that state college assistant professors are not executive officers within the meaning of present Neb. Const. art. IV, § 1, since they are not named in the article nor are they "the heads of such other executive departments as set forth herein or as may be established by law." In this he is quite correct. Assistant professors of state colleges are not constitutional executive officers. That does not, however, mean that they are not subject to the prohibition of article II. As noted earlier, article II is not limited in its application to officers, constitutional or otherwise, but extends to employees as well. If the state colleges are part of the executive branch, then article II prohibits respondent from maintaining his position at the college while he serves as a member of the Legislature.

When the 1875 Constitution was adopted, the executive

branch was defined in then article V, § 1, in terms of named constitutional officers: "The *executive department shall consist of* a governor, lieutenant-governor, secretary of state, auditor of public accounts, treasurer, superintendent of public instruction, attorney-general, and commissioner of public lands and buildings . . . ." (Emphasis supplied).

If article II is read in light of this language, it would appear that in 1875 a "person or collection of persons being [the executive department]" would have meant those individuals named in then article V, § 1. Had the Constitution remained unchanged since 1875, our inquiry on this question might have ended here. Our task is complicated, however, by subsequent amendments to then article V, § 1.

In 1920, article V, § 1, was amended and renumbered as article IV, § 1, and read, in relevant part: "The executive *officers* of the state shall be the Governor, Lieutenant Governor, Secretary of the State, Auditor of Public Accounts, Commissioner of Public Lands and Buildings, Treasurer, Attorney General, Superintendent of Public Instruction and the heads of such other executive departments as may be established by law." (Emphasis supplied.) In this version, the executive branch is no longer defined; instead, it states who the executive officers shall be and provides that additional executive agencies may be created by the Legislature. These changes were made in order to permit the creation of new executive agencies if and when the need should arise, see Nebraska Constitutions of 1886, 1871 & 1875 and Proposed Amendments Submitted to the People September 21, 1920, at 65, 67 (Nebraska Historical and Political Science Series Bull. 13, 1920), and appear to have been adopted in response to opinions announced by this court to the effect that the Legislature was without authority to create new executive agencies. See, e.g., *In re Railroad Commissioners*, 15 Neb. 679, 50 N.W. 276 (1884); *State v. Porter*, 69 Neb. 203, 95 N.W. 769 (1903); *Iams v. Mellor*, 93 Neb. 438, 140 N.W. 784 (1913). From this, it must be inferred that the old Constitution's definition of the executive branch was considered too restrictive and failed to meet the demands of a growing state.

In 1936, the Commissioner of Public Lands and Buildings

was deleted from article IV, § 1, and the Superintendent of Public Instruction was deleted in 1952. Except for these changes, the relevant language has remained the same since 1920. In *Swanson v. State*, 132 Neb. 82, 271 N.W. 264 (1937), we held that the 1936 amendment omitting the office of Commissioner of Public Lands and Buildings, while depriving the office of its status as a constitutional office, did not abolish the office.

Since the composition of the executive branch is no longer expressly defined in the Constitution, we must look to case law for guidance in determining what it is.

To review, article II divides the powers of government into three distinct branches, the legislative, executive, and judicial, and provides that "no person or collection of persons being one of these" branches "shall exercise any power properly belonging to either of the others, *except as hereinafter expressly permitted or directed.*" (Emphasis supplied). Nothing in the Constitution expressly, or even impliedly, directs that the prohibitions of article II not be applied to state senators. The inquiry thus turns to whether Neb. Const. art. VII, § 13, providing for the government of the state colleges, falls within the exception to article II.

We have determined that Neb. Const. art. XV, § 9, authorizing the Industrial Commission with administrative, legislative, and judicial powers, was within this exception to article II. See *School Dist. of Seward Education Assn. v. School Dist. of Seward*, 188 Neb. 772, 199 N.W.2d 752 (1972). We have likewise held that Neb. Const. art. IV, § 20, creating the State Railway Commission (now the Public Service Commission), which has legislative, executive, and judicial powers, is an exception to article II. See, *Swanson v. Sorensen*, 181 Neb. 312, 148 N.W.2d 197 (1967); *In re Lincoln Traction Co.*, 103 Neb. 229, 171 N.W. 192 (1919). We have also found that the former State Department of Education could be given duties that were legislative in character because the constitutional provision authorizing it, Neb. Const. art. VII, § 14 (since repealed), fit within the exception. See *School Dist. No. 8 v. State Board of Education*, 176 Neb. 722, 127 N.W.2d 458 (1964).

*School Dist. No. 8, supra, School Dist. of Seward Education Assn., supra,* and *In re Lincoln Traction Co., supra,* dealt with the institutional aspect of the separation of powers doctrine. These cases involved challenges to the agencies' exercise of legislative and judicial powers and not individuals holding positions in more than one governmental branch. While we have determined that the constitutional provisions authorizing these agencies expressly direct or permit them to exercise the powers of more than one branch, nothing in the opinions indicates that members of the agencies are excepted from the personnel aspect of article II.

Like the two school district cases, *Swanson v. Sorensen, supra,* did not address the dual position ban of article II. In that case, Swanson, the duly elected state Treasurer, brought a quo warranto action against Sorensen, the incumbent Treasurer, who had refused to relinquish his office on the ground that Swanson was ineligible for the office because he had been a member of the railway commission when he ran for office. Sorensen's claim was based on the prior provision of article IV, § 2, that "[n]one of the officers mentioned in this article shall be eligible to any other state office during the period for which they have been elected or appointed . . . ." The *Swanson* court concluded that because the constitutional amendment creating the railway commission was not adopted as an amendment to article IV but was simply inserted into that article by the compilers at a later date, the commissioners were not among the officers mentioned in article IV, § 2.

An exception to institutional application of the separation of powers doctrine does not imply an exception to the dual personnel ban. While it may be necessary for certain agencies to share attributes with the executive, legislative, and judicial branches in order for those agencies to carry out the function assigned to them in the Constitution, those needs do not require the agency to employ personnel who exercise power in another governmental branch.

Thus, we need not determine whether the government of the state colleges is free of the institutional prohibition of article II; we need merely determine whether the state colleges are properly considered to be part of the executive branch.

Although we have neither been directed to nor found any case explicitly stating that the state colleges are part of the executive branch, there are but three branches, and the state colleges clearly are not part of the judicial or legislative branches. See, *Swanson v. State, supra*; *State v. Furse*, 89 Neb. 652, 656, 131 N.W. 1030, 1031 (1911) ("the office of railway commissioner is, under the constitution, to be classed as an executive office. Of this we think there can be no doubt, as it can neither be said to be legislative, nor judicial, and the three classes are the only ones given by that instrument").

The Board of Regents of the University of Nebraska performs a function for the university which is identical to that of the Board of Trustees of the Nebraska State Colleges. While the Board of Regents is an "independent body charged with the power and responsibility to manage and operate the University," *Board of Regents v. Exon*, 199 Neb. 146, 148, 256 N.W.2d 330, 332 (1977), it is, nevertheless, an administrative or executive agency of the state, see *Board of Regents v. County of Lancaster*, 154 Neb. 398, 48 N.W.2d 221 (1951). As the regents are part of the executive branch, so, too, are the trustees.

Since the Board of Trustees, which governs the state colleges, is part of the executive branch, those who work for those colleges likewise are members of that branch. Respondent, as an assistant professor at the college, is thus a member of the executive branch within the meaning of article II.

## INTERRUPTIONS OF
## TEACHING RESPONSIBILITIES

Lastly, we must consider whether respondent's unpaid leaves of absence from the college during the Legislature's regular sessions and his removal from the college payroll during most of the Unicameral's special sessions have any legal significance.

As a tenured member of the college faculty, respondent likely possesses a legally protected expectation of continued employment. See *Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972). However, whether he does or does not possess such a legally protected right, the fact is that his position with the college has been renewed each and every year he has been a senator. While his leaves of absence and

removal from the college payroll have permitted him to interrupt his teaching responsibilities, they have obviously not severed his continuing relationship with the college.

The actuality thus is that at all relevant times respondent has simultaneously been a state senator and an assistant professor at the college. Consequently, his leaves of absence from the college and his intermittent removals from its payroll are not material to the issues presented in this case. Respondent is therefore a member of one branch of government, the executive, exercising the powers of another, the legislative, and, as a consequence, is in violation of article II of the state Constitution.

In so holding, we are not unmindful that a division of the Washington Court of Appeals, while recognizing that a violation of the canons of judicial conduct had occurred, recently determined that an attorney who heard a criminal case as a judge pro tempore while serving as a state senator had not violated the separation of powers doctrine. In so ruling, the court reasoned that the attorney had not exercised both offices simultaneously. *State v. Osloond*, 60 Wash. App. 584, 805 P.2d 263 (1991). However, the Washington Constitution does not have an express separation of powers provision, and the *Osloond* court was thus able to base its decision on more general principles than those which we are constrained to follow.

Nor are we unmindful of *State ex rel. Stratton v. Roswell Schools*, 111 N.M. 495, 806 P.2d 1085 (1991), a recent New Mexico appellate court decision which held that that state's separation of powers provision did not prohibit public school administrators and teachers from serving in the state Legislature. As we have previously noted, New Mexico's Constitution provides that "no person . . . charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others . . . ." N.M. Const. art. III, § 1. In other words, it prohibits the officers (persons charged with the exercise of powers) of one branch from exercising the powers (or acting as an officer) of a coordinate branch. Thus, the personnel aspect of the New Mexico provision is limited to

prohibiting one from being an officer in different branches simultaneously. In contrast, article II of our Constitution prohibits members of one branch from exercising the powers of a coordinate branch and therefore prohibits any member of one of the three branches—whether it be an officer or employee—from being an officer in another branch. Because the New Mexico provision is narrower than that of article II, the reasoning of *Stratton* is inappropriate under our Constitution.

Numerous other jurisdictions have addressed similar questions under various provisions of their state constitutions. The results, as illustrated earlier, are in no way uniform, but the following decisions evince that Nebraska does not stand alone in maintaining the independence of each of the coordinate branches of government: Alaska has held that its Constitution prohibits a legislator from holding a position as a teacher or superintendent in a state-operated school district. See *Begich v. Jefferson*, 441 P.2d 27 (Alaska 1968). The Arkansas Constitution prohibits a state legislator from being elected to and serving on the board of directors of a school district during his term in the Legislature. See *Williams v. Douglas*, 251 Ark. 555, 473 S.W.2d 896 (1971). The Connecticut Constitution has been held to prohibit members of the general assembly from concurrent employment as faculty or professional staff at a state college. See *Stolberg v. Caldwell*, 175 Conn. 586, 402 A.2d 763 (1978), *appeal dismissed, Stolberg v. Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). After Oregon held that a state legislator was ineligible for employment as a public school teacher, see *Monaghan v. School District No. 1*, 211 Or. 360, 315 P.2d 797 (1957), the Constitution was amended to permit legislators to teach; however, a judge was still prohibited from teaching at a state-funded college, see *In the Matter of Sawyer*, 286 Or. 369, 594 P.2d 805 (1979).

Justice Sutherland, commenting on the importance of the maintenance of separate branches, stated:

> If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—

independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments. James Wilson, one of the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each department required that its proceedings "should be free from the remotest influence, direct or indirect, of either of the other two powers." Andrews, The Works of James Wilson (1896), Vol. 1, p. 367.

*O'Donoghue v. United States*, 289 U.S. 516, 530, 53 S. Ct. 740, 77 L. Ed. 1356 (1933). The dynamics of power are perhaps best illustrated in this case by the fact that the Board of Trustees' policy manual on leaves of absence treats employees of the state colleges who hold political offices differently from those who do not. As noted earlier, employees who hold no political office ordinarily may take a leave of absence but once every 4 years; however, employees who hold a political office routinely may take leaves as often as they wish. Nor are political officeholders required to make the prearrangements required of those who hold no political office.

## CONCLUSION

The provisions of article II compel us to enter judgment for the relator and to order that respondent be, and he hereby is, ousted, removed, and excluded from his office as assistant professor at the college.

JUDGMENT FOR RELATOR.

HASTINGS, C.J., dissenting.

I respectfully dissent from the majority opinion because I believe that the court has gone beyond the issues as defined by the parties in this original action.

The issue before the court was "[w]hether an individual who teaches at a state college and who also serves in the Nebraska Legislature exercises the powers of both the executive and the legislative branches of state government in contravention of Article II Section 1 of the Nebraska Constitution." Brief for

relator at 1. Put another way, "[t]his is an original action in which the Attorney General seeks to determine whether the Respondent can constitutionally serve in the Nebraska Legislature and, at the same time, teach at Wayne State College." *Id*. at 2.

As I understand the claim, the relator seeks to have respondent removed from his position as a member of the faculty of a state college because "being one of these departments" (a member of the Legislature) he exercises the power "properly belonging to either of the others" (the executive department). See Neb. Const. art. II, § 1. I do not believe respondent exercises the powers of the executive department as a member of the faculty of Wayne State College and certainly the relator does not ask that the respondent, "being one of these departments" (executive), be removed for exercising the power "properly belonging" to the legislative branch.

> The powers of the government of this state are divided into three distinct departments, the legislative, executive, and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted.

Neb. Const. art. II, § 1. There is no question that the respondent, as a member of the Legislature, is a "person or collection of persons being one of these departments," i.e., the legislative department. The crucial question is whether the respondent "being one of these departments . . . exercise[s] any power properly belonging to either of the others," in this case, powers belonging to the executive department.

The purpose of this constitutional provision is to establish "the permanent framework of our system of government and to assign to the three departments their respective powers and duties, and to establish certain fixed principles upon which our government is to be conducted." *State, ex rel. Randall, v. Hall*, 125 Neb. 236, 242, 249 N.W. 756, 759 (1933). By adhering to this structure of government the preservation of liberty is best served. See The Federalist No. 47 (J. Madison).

However, "[a] rigid adherence to it [separation of powers] in

all cases would be subversive to the efficiency of the government and result in the destruction of the public liberties." 1 J. Story, Commentaries on the Constitution of the United States § 529 at 371 (3d ed. 1858). Furthermore, a justice of the U.S. Supreme Court has stated that while the doctrine of separation of powers "diffuses the power [of each branch of government] to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Co. v. Sawyer*, 343 U.S. 579, 635, 72 S. Ct. 863, 96 L. Ed. 1153 (1952) (Jackson, J., concurring). A hermetic seal around each branch of government would preclude the establishment of an effective government. *Buckley v. Valeo*, 424 U.S. 1, 121, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976).

A senatorial position in the Nebraska Legislature is a part-time position. Therefore, it is not uncommon for senators to have additional sources of income and careers. An uncompromising interpretation of the separation of powers would inhibit the ability of a part-time legislature to attract qualified members.

Moreover, "the concept of separation of powers is not one that is capable of precise legal definition yielding clear solutions to intragovernmental disputes." *Stolberg v. Caldwell*, 175 Conn. 586, 596, 402 A.2d 763, 769 (1978). Consequently, the doctrine of separation of powers is not always clear in its application to the day-to-day functions of the government.

It is clear, however, that the executive branch is generally described as the branch of government that executes the laws of the state.

The members of the executive branch of government are divided into two categories: the executive officers and the employees. See, *State, ex rel. O'Connor, v. Tusa*, 130 Neb. 528, 265 N.W. 524 (1936); *Home Savings & Loan Ass'n v. Carrico*, 123 Neb. 25, 241 N.W. 763 (1932). According to the Nebraska Constitution, the executive officers of the state who are responsible for carrying out the laws of the state are the "Governor, Lieutenant Governor, Secretary of State, Auditor of Public Accounts, Treasurer, Attorney General, and the heads of such other executive departments as set forth herein or as may be established by law." Neb. Const. art. IV, § 1. See

Neb. Rev. Stat. § 49-1436 (Reissue 1988). An assistant professor is not named therein.

Mere exclusion of a specific government position does not dictate the person's status as an officer or employee.

*State v. Loechner*, 65 Neb. 814, 91 N.W. 874 (1902), was one of the first cases to recognize the division of employment in the executive branch of government. *Loechner* divided the executive branch into two categories: the ministerial officers and the executive officers. A ministerial officer is an officer with

> no power to judge the matter to be done, and [whose office requires] him to obey some superior. An executive officer, in the proper sense of the term, is one whose duties are mainly to cause the laws to be executed; such as the president, the governor of a state, or the chief executive officer of a city.

*Loechner, supra* at 818, 91 N.W. at 875. In *Home Savings & Loan Ass'n v. Carrico, supra* at 30, 241 N.W. at 765, an employee was described as "one who is bound, in some degree, to the duty of service, and who is subject to the master's command as to how to do the work." An officer has "the right, duty and authority conferred by law, by which, for a given period, an individual is invested with some portion of the sovereign functions of government for the benefit of the public." *Id.*

The crucial factor in determining whether a position is an executive office is whether the duties of the office include exercising some degree of the sovereign power of the state. See, *State, ex rel. O'Connor, v. Tusa, supra*; *Home Savings & Loan Ass'n v. Carrico, supra*. A precise definition of "sovereign power" is elusive. However, it has been defined as follows:

> "If specific statutory and independent duties are imposed upon an appointee in relation to the exercise of the police powers of the state, if the appointee is invested with independent power in the disposition of public property or with power to incur financial obligations upon the part of the county or state, if he is empowered to act in those multitudinous cases involving business or political dealings between individuals and the public, wherein the

latter must necessarily act through an official agency, then such functions are a part of the sovereignty of the state." *State ex rel. Webb v. Pigg*, 363 Mo. 133, 138, 249 S.W.2d 435, 438 (1952). Often, the degree of independence of a governmental position has helped determine whether the position is an executive office exercising sovereign power. The greater the position's independence, the more likely it is to be categorized as an executive office. See, *State ex rel. Barney v. Hawkins et al.*, 79 Mont. 506, 257 P. 411 (1927); *Aldine Ind. Sch. Dist. v. Standley*, 154 Tex. 547, 280 S.W.2d 578 (1955). One in a position in the executive branch that does not exercise the sovereign powers of the state is normally referred to as an "employee."

Here, as a professor, Conway does not have independent control over the education policies of the state. It is true that Conway does have control over his students in a classroom setting; however, this control is limited. Conway structures the class syllabus, grades tests, and assigns homework. The independence Conway has in the classroom is illusory because at all times he is under the direct supervision of the department chairman. The chairman also decides what classes Conway will teach and evaluates his performance.

Teachers have generally been categorized as employees. See, e.g., *Jackson v. Roberts*, 774 S.W.2d 860 (Mo. App. 1989); *Ruiz v. State*, 540 S.W.2d 809 (Tex. Civ. App. 1976); *Duncan v. Koustenis*, 260 Md. 98, 271 A.2d 547 (1970); *Main v. Claremont Unified School Dist.*, 161 Cal. App. 2d 189, 326 P.2d 573 (1958); *State, ex rel. Scarl, v. Small*, 103 Ohio App. 214, 145 N.E.2d 200 (1956); *Coble, Appellant, v. Metal Twp. Sch. Dist.*, 178 Pa. Super. 301, 116 A.2d 113 (1955); *Seher v. Woodlawn School Dist.*, 79 N.D. 818, 59 N.W.2d 805 (1953); *Leymel v. Johnson*, 105 Cal. App. 694, 288 P. 858 (1930); *State ex rel. Board of D. S. D. No. 306 v. Preston*, 120 Wash. 569, 208 P. 47 (1922).

In *Ruiz v. State, supra*, the Texas Court of Civil Appeals stated that a public school teacher has "[n]o sovereign function of government . . . conferred upon him for the benefit of others, largely independent of the controls of others." 540 S.W.2d at 812. "No matter how highly we [the court] regard the

profession of teaching, we cannot conclude that this teacher is exercising some of the sovereign powers of the State . . . ." *Id.* See, *Main v. Claremont Unified School Dist., supra*; *Leymel v. Johnson, supra.*

At the college level of public education a professor is still considered an employee. See, *Boyett v. Calvert*, 467 S.W.2d 205 (Tex. Civ. App. 1971); *Tilley v. Rogers*, 405 S.W.2d 220 (Tex. Civ. App. 1966); *Martin v. Smith*, 239 Wis. 314, 1 N.W.2d 163 (1941); *Hartigan v. Board of Regents*, 49 W. Va. 14, 38 S.E. 698 (1901).

In *Hartigan v. Board of Regents, supra,* a college professor contested his dismissal from a state university. Although this case was decided at the turn of the century, its rationale has not aged and it retains its vitality. The court expressed that it is the Board of Regents that is charged with carrying out the public function. In carrying out this public function it employs professors. The court further held that "a professor in the university wields no particle of sovereign governmental authority." *Hartigan, supra* at 22, 38 S.E. at 701.

A more recent Texas case held that a professor at a state university is an agent of the board of directors, the members of which are in turn the executive officers. *Boyett v. Calvert, supra.*

Wisconsin has further strengthened the view that a college professor is not an executive officer. In *Martin v. Smith, supra,* the president of the University of Wisconsin, a public institution, was deemed an employee for the Board of Regents. The court declared that the president of the university is subject to the actions of the Board of Regents and is subordinate to it. Because of the president's lack of independence, he did not exercise the sovereign power of the state. It is the Board of Regents that exercises the sovereign power of the state. *Martin v. Smith, supra.*

It is clear from the relevant case law that the position of a public school teacher or that of a professor of a public college or university is that of an employee of the state and not an executive officer. However, some jurisdictions prohibit a professor of a state university from being a member of the legislature of the state. These cases involve statutory

prohibitions; thus they are distinguishable from the case at bar.

In *Stolberg v. Caldwell*, 175 Conn. 586, 402 A.2d 763 (1978), the Connecticut Supreme Court held that a member of the faculty at a state college is a member of the executive branch of government and therefore could not retain his position as a tenured professor and still be a member of the state's Legislature. In reaching this conclusion the court recognized that the separate branches of government do overlap and a clear distinction cannot always be made. However, unlike Nebraska, Connecticut had a statute that declared that the state board of higher education was within the executive branch of government. Furthermore, according to the Connecticut Constitution, the board of trustees is free to exercise independent judgment in carrying out the education policies of the state. *Stolberg, supra.*

Finally, the Connecticut Supreme Court also used a statutory dual-job ban as a basis for declaring a teacher an officer. The statute stated that " '[n]o member of the general assembly shall . . . be . . . appointed . . . to any position in the judicial, legislative or executive department of the state government . . . .' " *Stolberg, supra* at 593, 402 A.2d at 768. The court pronounced that the position of a teacher is an "appointive position." The court reached this conclusion by broadly defining the meanings of "appointment" and "position." The court stated:

> The fact that the position to which the plaintiff was appointed was not, in the legal sense, an office but merely an employment does not render the dual-job ban inapplicable under the facts presented since an employee can be said to have been assigned or designated to do a certain job. . . . Moreover, the term "position" . . . dealing with state employees, is defined as "a group of duties and responsibilities currently assigned or designated by competent authority to require the services of one employee." Hence . . . a "position or office," cannot be said to be limited to office-holding alone—it was clearly intended to encompass state employment generally.

*Stolberg, supra* at 594, 402 A.2d at 768.

In view of the fact that the board of trustees is able to appoint

teachers to their position, that position is an "appointive position," and teachers are therefore executive officers. *Stolberg, supra*.

In *Galer v. Regents of Univ. System*, 239 Ga. 268, 236 S.E.2d 617 (1977), the Supreme Court of Georgia held that a statute making it unlawful for members of the state's Legislature to hold office or employment in the executive branch was constitutional. The constitutional provision for separation of powers justified the statute. The statute, Ga. Code Ann. § 2309 (1972) states: " 'It shall be unlawful for (a) members of the General Assembly to accept or hold *office or employment* in the executive branch of the State Government, or any agency thereof . . . .' " (Emphasis supplied.) *Galer, supra* at 269, 236 S.E.2d at 618. Thus, the court held that a college professor at a state university could not maintain his teaching position. Although the court made no formal ruling on whether a professor was an officer or an employee (the statute applied equally to an officer or an employee), the terminology used by the court when referring to the teaching position was that of "employee." *Galer, supra*.

Contrary to the weight of decisions before it and the cases since its publication, *Eason v. Majors*, 111 Neb. 288, 196 N.W. 133 (1923), held that the head of the department of English at the state normal school at Peru was an executive officer of the state. In *Eason*, the State Board of Education dismissed the teacher without following the statutory guideline for dismissal. The president of the school board then appointed a new teacher to fill the vacancy. Eason brought a quo warranto action to determine whether the new teacher had the right to hold his position and whether Eason's dismissal was proper. *Eason* defined the term "office" as "any position where authority is coupled with duty . . . for a public purpose." *Eason, supra* at 290, 196 N.W. at 133. This broad definition of a public or executive office allowed the court to rule that the head of a department was an executive officer and, therefore, a person's right to exercise the powers of that office may be challenged by a quo warranto proceeding.

The *Eason* court consisted of Chief Justice Morrissey, Judges Rose and Good, and District Judge Shepherd, the last of

whom authored the opinion. That court apparently ignored prior Nebraska case law holding that a public school teacher is not an officer, nor is the position itself an office. See, *State v. Smith*, 49 Neb. 755, 69 N.W. 114 (1896). See, also, *Bays v. The State*, 6 Neb. 167 (1877). (*State v. Loechner*, 65 Neb. 814, 91 N.W. 874 (1902), held that a member of a board of education was not an executive officer.)

Furthermore, roughly 30 years after the decision in *Eason*, this court held once again that a public school teacher is not an executive officer of the state. In *Greer v. Chelewski*, 162 Neb. 450, 455, 76 N.W.2d 438, 442 (1956), this court stated:

As to teachers' contracts, we have said: "The contract to teach in the common or free schools of the grade of the one in the district in which this controversy arose is one of employment, and the relative positions occupied by the district represented by the board and the teacher are those of employer and employee. A teacher in the schools of the ordinary district is not a public officer, nor is his position an office." State ex rel. Lewellen v. Smith, 49 Neb. 755, 69 N.W. 114.

I find no distinction in principle between the present case and those just cited. *Eason* stands alone in its holding.

*Eason* is also factually different from the case at bar. In *Eason*, the teacher was the head of his department. Here, Conway is not the head of the department. Conway serves under the direct control of the chairman of the business division. If one carries the layer of responsibility to its ultimate end, "[a]ll teachers and other subordinates in each state college shall be under the direction of the president thereof, subject to the general regulations of the board." Neb. Rev. Stat. § 85-306 (Reissue 1987). Preceding that language in § 85-306 is the following: "The president of each school shall be the chief executive officer thereof and shall be responsible to the board for the control and management of the same." Proceeding backward, so to speak, to Neb. Rev. Stat. § 85-301 (Reissue 1987), one finds that

[t]he general government [of the state colleges] shall be vested, under the direction of the Legislature, in a board of seven members, to be known as the Board of Trustees of

the Nebraska State Colleges, six of whom shall be appointed by the Governor, with the advice and consent of the Legislature . . . .

In the final analysis, Conway lacks the independence that would accompany a higher position. This independence, or rather the lack thereof, factually distinguishes this case from *Eason*.

Although this action does not deal with conflict of interest as such, i.e., the constitutional provision on its face does not prohibit one person from being a member of two branches of government, concern is raised whether Conway, as a state legislator, would have a personal interest when voting for school funding. The Nebraska Political Accountability and Disclosure Act, Neb. Rev. Stat. §§ 49-1401 to 49-14,140 (Reissue 1988 & Cum. Supp. 1990), outlines the proper procedure to be followed if there is a conflict of interest. Section 49-1493(5) (Reissue 1988) states that members of the state Legislature must file a statement of financial interests. Thus, as a legislator, Conway is required to file a statement. However, if Conway were only a professor, he would not be obligated to file any statement of interests under this statute. The only persons required to file statements in the education field are individuals holding an office, such as the Commissioner of Education, members of the State Board of Education, or members of the Board of Regents of the University of Nebraska. § 49-1493(2). Interestingly enough, members of the Board of Trustees of the Nebraska State Colleges are not specifically named, and it is doubtful that they would be included in the "catchall" sections.

When a conflict of interest arises or is about to arise, a legislator must submit a written statement describing the conflict and whether or not he will participate in the vote. § 49-1499 (Reissue 1988). The statute does not require a senator to abstain from voting. Accordingly, Conway must file such a statement when school funding is being discussed or voted upon.

The Legislature has taken steps to remedy any possible conflicts of interest. Whether the procedures are adequate is a question not before us at this time.

In order for a part-time Legislature to run efficiently, it may be necessary to allow some overlap between the different branches of government. Generally, people who are government employees may serve as members of the Legislature if their duties do not conflict. Here, Conway is in a unique position to serve in the Legislature, as well as to be an employee of the executive branch. In his capacity as a professor he is not in a position to make policy judgments, he does not exercise independent power over the curriculum, and he does not receive any compensation when he takes the required leave of absence when the Legislature is in session. By allowing this degree of overlap between the executive branch and the legislative branch, the central purpose behind the rationale of separation of powers will not be grossly undermined.

I would deny and dismiss relator's petition in quo warranto.

SHANAHAN, J., dissenting.

Chief Justice Hastings is correct in his analysis, which is based on sound legal principles, but common sense and logic prompt further comment. For that reason, I join in the Chief Justice's dissent and conclusion that this court's majority has misconstrued the limitation expressed in Neb. Const. art. II, § 1: "[N]o person . . . being one of these departments [legislative, executive, or judicial] shall exercise any power properly belonging to either of the others." To paraphrase the foregoing, Gerald A. Conway, as a member of the Nebraska Legislature, cannot exercise power which constitutionally belongs only to the executive branch. That premise serves as the foundation for answering the question in Conway's case. As Chief Justice Hastings has emphasized, the constitutional provision under examination is not designed against a "conflict of interests" situation, which is covered in other areas of Nebraska law. Consequently, the constitutional provision's clear language controls the disposition of Conway's case.

However, the majority sinks in a sea of sophistry with its "separation of powers" argument. For instance, all agree that Conway is subject to departmental supervision at Wayne State, including departmental specification of the hours taught, and further agree that Conway does not determine which courses

will be included in Wayne State's curriculum and cannot personally, either directly or formally, discipline any of his students. The majority, however, derives great strength, if not total support, from the characterization of a "teacher" expressed in *Eason v. Majors*, 111 Neb. 288, 292, 196 N.W. 133, 134 (1923), namely, a teacher has "wide use of discretion . . . must prescribe courses [and] establish discipline." Applying those criteria to Conway's case, he is not a teacher within the characterization or definition found in *Eason*. Nevertheless, everyone knows that Conway is a teacher. As Chief Justice Hastings has carefully pointed out, *Eason* is an aberrancy, neither based on Nebraska precedent nor recognized as precedent, except by the majority of this court today, concerning a definition of "teacher," and is unworthy of adherence.

In Conway's case, key questions are: What power is exercised by Gerald Conway as a teacher? Is that power constitutionally reserved to the executive branch only? More simply, is Conway doing something that only the executive branch can constitutionally perform? Therefore, pivotal in Conway's case is whether sovereign power is exercised in common by Conway and the executive branch of government. Executive power, in a constitutional form of government such as Nebraska's, is the capability to carry laws into effect as a matter of state policy. Conway teaches a business course in college. He is not officially promulgating state policy, that is, furthering a course of action selected by the executive branch of government in political matters. In contact with students, Conway, as a teacher, has the basic duty, and corresponding fundamental power, to convey truth to his students. Is providing truth an exercise of sovereign power constitutionally reserved to the executive branch? Why, even a legislature or a court traffics in truth on occasion.

Nevertheless, the majority proposes: Conway exercises power; but a member of the executive branch of government exercises power; therefore, Conway is a member of the executive branch of government. Anyone who stops to examine the preceding pseudosyllogism will immediately realize that the term of comparison is "power," a term which must have the same meaning for both Conway and the executive branch;

otherwise, under the laws of logic, there is no means of comparison through a middle term for a valid syllogism. Still, one cannot rationally reject the self-evident truth in the proposition that if logic is inapplicable in Conway's case, the laws of logic are equally inapplicable; hence, according to the majority's methodology, the following becomes irrefutable syllogistic truth: Horses pull wagons; but cows give milk; therefore, it will rain tomorrow.

There need be no concern that this court's Chief Justice will serve as Attorney General of Nebraska. Rather, the grave concern is that this court will presently serve as conventioneers to a past constitutional convention and insert into Neb. Const. art. II, § 1, an interpretation for language which needs no interpretation, constitutional language which, thanks to teachers of yesteryear, is a clearly expressed prohibition against one branch of government's usurpation of a constitutionally separated sovereign power belonging only to another governmental branch, and is not a prohibition against one's offer of teaching talents.