REQUESTED BY: Major General Stanley M. Heng Adjutant General, Nebraska Military Department
You have requested an opinion as to whether current law permits the Governor, acting upon the request of the governor of a sister state, to send Nebraska National Guard personnel to aid the civil authorities of the requesting state. Your inquiry does not specify any particular use of Nebraska National Guard forces but is prompted by an increased possibility of using the Guard personnel across state boundaries during civil defense and disaster emergencies.
Our analysis begins with the principle that "[t]he office of governor does not exist by virtue of the common law. Under the American system [of government, the office is vested by virtue of a state's constitution]." 38 Am.Jur.2d, Governor, § 1 (1968). Further, a constitution's grant of "the supreme executive power to a governor implies such power as will secure the efficient execution of the laws, . . . to be accomplished, however, in the manner, by the methods, and within the limitations prescribed by the Constitution and statutes of the state." Id. at § 4. Nebraska's Constitution provides that "[t]he Governor shall be commander-in-chief of the military and naval forces of the state (except when they shall be called into service of the United States) and may callout the same to execute the laws, suppress insurrection, andrepel invasion." Neb. Const. art. IV, § 14 (emphasis added).
In construing this provision, we are bound by the cardinal rule that the state Constitution must be applied and enforced as it is written. State ex rel. Spire v. Conway, 238 Neb. 766,472 N.W.2d 403 (1991). "Moreover, constitutional provisions are not open to construction as a matter of course; construction of a constitutional provision is appropriate only when it has been demonstrated that the meaning of the provision is not clear and that construction is necessary." 238 Neb. at 774-775,472 N.W.2d at 408-409; In re Application A-16642, 236 Neb. 671,463 N.W.2d 591 (1990). Finally, if a provision of the Constitution must be construed because its meaning is not clear, then "its words are to be interpreted in their most natural and obvious sense, although they should receive a more liberal construction than statutes. . . ." 238 Neb. at 775,472 N.W.2d at 409; State ex rel. Spire v. Public Emp. Ret. Bd.,226 Neb. 176, 410 N.W.2d 463 (1987). Pursuant to these guidelines, we now address your inquiry.
The State Constitution The Military Code.
In a prior opinion, this office concluded that the provisions of Neb. Const. art. IV, § 14, which vest the Governor with the authority to use Nebraska National Guard personnel to "suppress insurrection" and to "repel invasion," are powers which the Governor may exercise only within the State of Nebraska. Informal Op. Att'y Gen. No. I92-084 (December 4, 1992).See also Neb. Rev. Stat. § 55-117 (1993) (emphasis added) (providing that when Nebraska National Guard troops are ordered into active service by the Governor in time of war, invasions, riot, rebellion, insurrection, disaster, or reasonable apprehension thereof, such active service shall be "for military service, within the state"). With respect to the clause of Neb. Const. art. IV, § 14, which vests the Governor with power to activate the Nebraska National Guard "to execute the laws," this office concluded that no clear authority existed to definitively state the limits of that power. While noting that the phrase might be construed to authorize the Governor to execute the laws of a sister state, we doubted the validity of such a construction. Op. Att'y Gen. No. I92-084 at 2-3. We now conclude that by vesting the Governor with authority to mobilize the Nebraska National Guard to "execute the laws," Article IV, § 14 of the state Constitution limits that power to execution of public law within state boundaries.
This determination is based upon two factors. First, the Nebraska Supreme Court has expressly held that "our state law has no extraterritorial effect." State v. Karsten,194 Neb. 227, 229, 231 N.W.2d 335, 336 (1975); see also Statev. Hyslop, 131 Neb. 681, 269 N.W. 572 (1936). Therefore, while the state Constitution vests very broad powers in the Governor, in his capacity as commander-in-chief of the militia, to direct Nebraska National Guard forces within state boundaries, those state constitutional powers would have no effect beyond the state's boundaries. A second factor is based upon a plain reading of the statutes enacted by the Legislature as Nebraska's "Military Code," Neb. Rev. Stat. § 55-101 — § 55-180
(1993). Pursuant to Neb. Rev. Stat. § 55-115, the Governor "may employ the militia or any part of it in the defense or relief of the state, or any part of its inhabitants or territories. . . ." The Legislature has further specified that Nebraska National Guard forces "shall be first called out by the Governor on all occasions for military service within thestate, in time of war, invasions, riot, rebellion, insurrection, disaster, or reasonable apprehension thereof. . . ." Neb. Rev. Stat. § 55-117 (emphasis supplied). Therefore, we find neither inherent authority in Neb. Const. art. IV, § 14 nor statutory authority in Neb. Rev. Stat. § 55-115 or Neb. Rev. Stat. § 55-717 which would authorize the Governor to mobilize Nebraska National Guard personnel across state boundaries to aid civil authorities of another state.
Interstate Compacts and Agreements.
Although we have concluded that neither the state's Constitution nor Military Code vest the Governor with inherent power to authorize extraterritorial use of the Nebraska National Guard, such power, in limited circumstances, has been vested in the Governor pursuant to Nebraska's ratification and enactment of the "Interstate Civil Defense and Disaster Compact" [hereinafter "Interstate Compact"]. See Neb. Rev. Stat. §81-829.56 (1994) (enactment); Neb. Rev. Stat. Vol. 2A, Appendix1-109 (1995) (compact text). Upon the enactment of Neb. Rev. Stat. § 81-829.56, Nebraska has, by operation of law, entered into the Interstate Compact with all states bordering Nebraska which have enacted the Compact in substantially the same form.[1] In addition, the "Governor may enter into the [Interstate C]ompact with any state which does not border this state if [the Governor] finds that joint action with the state is desirable in meeting common intergovernmental problems of emergency disaster planning, prevention, response, and recovery." Neb. Rev. Stat. § 81-829.56(2).
The purpose of the Interstate Compact
 is to provide mutual aid among the states in meeting any emergency or disaster from enemy attack or other cause (natural or otherwise) including sabotage and subversive acts and direct attacks by bombs, shellfire, and atomic, radiological, chemical, bacteriological means, and other weapons.
Interstate Civil Defense and Disaster Compact, Article 1, Neb. Rev. Stat. Vol. 2A at 898. Article 3 of the Compact specifies:
 Any party state requested to render mutual aid shall take such action as is necessary to provide and make available the resources covered by this compact in accordance with the terms hereof. . . . Each party state shall extend to the civil defense forces of any other party state, while operating within its state limits under the terms and conditions of this compact, the same powers (except that of arrest unless specifically authorized by the receiving state), duties, privileges and immunities as if they were performing their duties in the state in which normally employed or rendering services. . . .
Id. at 899.
Therefore, the Governor may, to the extent and solely for the purposes authorized by the Interstate Compact, activate Nebraska National Guard personnel to aid another state upon request of that state. If your intent is to seek a broader use of Guard personnel for other training or "mutual aid" purposes, then additional legislation would be required to effect such expanded use of Guard personnel.[2]
We note the requirement of the Interstate Compact that it "shall be subject to approval by Congress unless prior congressional approval has been given." Id. at 901. The prerequisite of congressional ratification of compacts entered into amongst states is generally a standard provision placed in compact documents to ensure compliance with the compact clause of the U.S. Constitution. The clause mandates that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State. . . ." U.S. Const. art. I, § 10, cl. 3. The United States Supreme Court has construed the compact clause narrowly, and, therefore, has upheld the validity of multistate compacts which have not been formally ratified by the U.S. Congress so long as those compacts or agreements do not affect "the political power or influence" of a particular state or "encroach . . . upon the full and free exercise of federal authority." Virginia v. Tennessee,148 U.S. 503, 520 (1893); United States Steel Corp. v.Multistate Tax Commission, 434 U.S. 452, 469 (1978) (explicitly holding that "not all agreements between [s]tates are subject to the strictures of the compact clause").
More recently, in Cuyler v. Adams, 449 U.S. 433
(1981), the Supreme Court further expanded the instances in which the validity of multistate compacts would be upheld despite specific congressional ratification. The Court assessed a prisoner's challenge to the "Interstate Agreement on Detainers," reciprocal legislation which had been enacted by multiple states. In order to decide the prisoner's challenge, the Court first determined that the detainer agreement was a formal compact within the meaning of U.S. Const. art. I, § 10, cl. 3.Id. at 438. Then the Court determined that "Congress may consent to an interstate compact by authorizing joint state action in advance or by giving expressed or implied approval to an agreement the states have already joined." Id. at 441. The Court concluded that Congress had given its consent to the interstate detainer compact in advance by its previous enactment of the "Crime Control Consent Act of 1934."Id.
The Cuyler principle may be applied to the "Interstate Civil Defense and Disaster Compact." Prior to Nebraska's initial ratification of the Interstate Compact in 1953,[3] the U.S. Congress had enacted legislation authorizing the states "to negotiate and enter into interstate civil defense compacts. . . ." 50 U.S.C. App. § 2281 (1991) (subsequently repealed by Pub.L. No. 103-337, Div. C., Title XXXIV, § 3412(a), October 5, 1994, 108 Stat. 3111). Additionally, pursuant to its enactment of "The Disaster Relief Act of 1974," Pub.L. N. 93-288, Title VI, § 601, the U.S. Congress authorized the Director of the Federal Emergency Management Agency to "assist and encourage the States to negotiate and enter into interstate emergency preparedness compacts." 42 U.S.C. § 5196(h) (1995). Nebraska's enactment of the current Interstate Compact in 1975 was based upon Congress' enactment of the 1974 federal legislation.[4]
 Conclusion
Neither Nebraska's Constitution nor its Military Code vest the Governor with specific or implied power to use Nebraska National Guard personnel in a state active-duty status across state borders. The "Interstate Civil Defense and Disaster Compact," which has been ratified and enacted as state law vests the Governor with authority to utilize Nebraska National Guard personnel — in accordance with and subject to the terms and conditions of both the Compact and Neb. Rev. Stat. §81-829.56 — to effect the purposes of the Interstate Compact. Further statutory enactments would be required to use Guard forces for other training or deployment purposes or for "mutual aid" purposes broader than those now set forth in the Interstate Compact.
Sincerely,
 DON STENBERG Attorney General
 Lauren L. Hill Assistant Attorney General
Approved:
Don Stenberg
Attorney General
[1] See Interstate Compact, Article 12 (providing that the Compact becomes operative immediately upon its ratification by any state).
[2] In order to accomplish that end, several states have enacted the "National Guard Mutual Assistance Compact."See, e.g., Alaska Stat. § 26.25.010
— § 26.25.030 (1992); Fla. Stat. Ann. § 250.540 — §250.549 (Cum. Supp. 1996); Kan. Stat. Ann. § 48-1701 — §48-1703 (1994); N.C. Gen. Stat. § 127A-175 — § 127A-184
(1986); S.D. Codified Laws Ann. § 33-9-12 (1994); Va. Code Ann. § 44-54.1 -§ 44-54.3 (1994).
[3] See 1953 Neb. Laws, c. 202, p. 709.
[4] See Neb. Rev. Stat. § 81-829.74 (1994).